UNITED STATES of America, Appellee,

v.

Antonio Cruz VAZQUEZ, Benito Luis Cortina, Antonio Gonzalez, Andres Rene Rappard, and Jose De La Fe-Quintas, Appellants.

Nos. 678, 694, 695, 706 and 707, Dockets 78–1366, 78–1370, 78–1378, 78–1379 and 78–1398.

United States Court of Appeals, Second Circuit.

Argued Feb. 26, 1979.

Decided Aug. 24, 1979.

1270

Gerald L. Shargel, New York City (Graham Hughes, Fischetti & Shargel, New York City, of counsel), for defendant-appellant Vazquez.

David Breitbart, New York City, for defendant-appellant Cortina.

Lawrence S. Bader, New York City (Segal & Hundley, New York City, of counsel), for defendant-appellant Gonzalez.

Michael Young, New York City (Goldberger, Feldman & Dubin, New York City, of counsel), for defendants-appellants Rappard and De La Fe-Quintas.

Susan E. Shepard, Asst. U. S. Atty., Eastern District of New York, Brooklyn, N. Y. (Edward R. Korman, U. S. Atty., Harvey M. Stone, Asst. U. S. Atty., Eastern District of New York, Brooklyn, N. Y., of counsel), for the United States of America.

Before FEINBERG, TIMBERS and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

Antonio Cruz Vazquez, Benito Cortina, Antonio Gonzalez, Andres Rene Rappard, and Jose De La Fe-Quintas appeal from judgments of conviction entered in the United States District Court for the Eastern District of New York, Jacob Mishler, Chief Judge. Appellant Vazquez was convicted, after a jury trial, of conspiring to distribute heroin, in violation of 21 U.S.C. § 846; possessing with intent to distribute 44 pounds of heroin, 21 U.S.C. § 841(a)(1); and conducting a continuing criminal enterprise, 21 U.S.C. § 848. Cortina, Gonzalez, Rappard and De La Fe were convicted only on the conspiracy count—Cortina and Gonzalez after a jury trial, Rappard and De La Fe after guilty pleas.[1] Each has been sentenced to a term of imprisonment and a special parole term; in addition, Vazquez and Gonzalez have been fined.[2]

## I. Background

The issues raised by the appeals before us do not necessitate a detailed elaboration of the complex and extensive narcotics opera-

---

1. With the agreement of the government and the approval of the court, Rappard and De La Fe preserved the right to appeal the district court's denial of their motions to suppress certain wiretap evidence. *See United States v. Price,* 599 F.2d 494, 496 n.1 (2d Cir. 1979), and cases cited therein.

2. Vazquez was sentenced on the criminal enterprise count to a term of 15 years' imprisonment, lifetime special parole, and a $25,000 fine, and on the possession count to a term of 15 years' imprisonment (concurrent) and a $100,000 fine. Cortina was sentenced to a term of 15 years' imprisonment and a special parole term of 15 years. Gonzalez was sentenced to a term of 10 years' imprisonment, a special parole term of 15 years, and a $25,000 fine. Rappard was sentenced to a term of 5 years' imprisonment and a special parole term of 10 years. De La Fe was sentenced to a term of 3 years' imprisonment and a special parole term of 7 years.

tion in which appellants participated.[3] Briefly, the government presented evidence showing that, with the help of an airline employee stationed in Arizona, participants in the conspiracy imported from Mexico large quantities of heroin and exported, in exchange, large sums of cash. The evidence indicated that the heroin was then transferred from the western states to New York or New Jersey, where it was ultimately sold.

■ Although the government called many witnesses and introduced many exhibits, a great deal of trial time was devoted to presenting to the jury, over the objections of the defendants, the contents of various intercepted telephone conversations in which one or more of the conspirators had participated.[4] The federal statute governing wiretapping[5] both restricts the availability of this singularly intrusive investigative technique and imposes a number of obligations on those federal or state authorities who are involved in its authorization, implementation or supervision. Failure to comply with certain of the procedures specified necessitates the suppression of the evidence obtained.[6] Thus, in reviewing the district court's decision not to exclude the challenged evidence, we must closely examine the route by which the intercepted conversations got into court in order to determine whether the statutory pre-conditions to its admission were satisfied.

On July 5, 1977, an investigator representing the Narcotics Strike Force of the Hudson County, New Jersey, Prosecutor's Office applied to Judge Arthur J. Blake of the New Jersey Superior Court for an order authorizing the interception of certain wire communications pursuant to the New Jersey Wiretapping and Electronic Surveillance Control Act.[7] The investigator's supporting affidavit stated that the Prosecutor's Office had obtained information from several sources (including interviews with confidential informants, visual surveillance of suspects, and examination of telephone company records) linking the use of four New Jersey telephones with the operation of a large narcotics conspiracy controlled by appellant Vazquez. According to the affidavit, the Prosecutor's Office was of the view that electronic surveillance of four specified telephones would reveal informa-

---

3. No challenge has been made to the sufficiency of the evidence presented to support the verdicts rendered as to the three appellants who proceeded to trial: Vazquez, Gonzalez and Cortina.

4. The intercepted conversations were conducted almost entirely in Spanish. Although none of the jurors spoke Spanish, tapes of a few key conversations were played in court. On these occasions, the jurors were given transcripts of English translations of the conversations. These transcripts did not identify the speakers. The jurors were permitted to read along, and to make notes if they wished to do so, while an agent on the witness stand read aloud government-prepared English translations, identifying the various speakers as he read. On other occasions, the playing of the Spanish tapes was omitted but the rest of the procedure remained the same.

No challenge to the accuracy of either the transcriptions or the translations has been made. Appellant Cortina, however, does challenge the district court's decision to allow the government to proceed in this manner. Judge Mishler cautioned the jury to evaluate the testimony bearing on the accuracy of the transcription, the translation from the Spanish, and the identification of the speakers, and he made clear that the transcripts were to be used only as aids: "The mere fact that it is in typewritten form does not mean you must accept it . . . . [The transcripts] are merely guides, subject to assessment by you as to the accuracy and the weight to be given . . . ." Tr. at 890. Under these circumstances, we cannot agree with Cortina's contention that the procedures followed deprived him of a fair trial. *Cf. United States v. Lam Lek Chong,* 544 F.2d 58, 71 (2d Cir. 1976), *cert. denied,* 429 U.S. 1101, 97 S.Ct. 1124, 51 L.Ed.2d 550 (1977); *United States v. Chiarizio,* 525 F.2d 289, 294 (2d Cir. 1975); *United States v. Marin,* 513 F.2d 974, 977 (2d Cir. 1975); *United States v. Koska,* 443 F.2d 1167, 1169 (2d Cir.), *cert. denied,* 404 U.S. 852, 92 S.Ct. 92, 30 L.Ed.2d 92 (1971).

5. Title III of the Omnibus Crime Control and Safe Street Act of 1968, 18 U.S.C. §§ 2510 *et seq.*

6. *See id.* §§ 2518(10)(a) and 2518(8)(a); *but see United States v. Donovan,* 429 U.S. 413, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977).

7. N.J.Stat.Ann. 2A:156A–1 *et seq.*

tion concerning the imminent shipment of a large quantity of heroin into the New York-New Jersey area. On the basis of this affidavit, the adequacy of which is discussed in part III of this opinion, Judge Blake issued an order dated July 5th, 1977, authorizing 20-day wiretaps on the four telephones, the last four digits of which are 0027, 9462, 5693, and 5699. On July 22, 1977, the New Jersey Superior Court authorized a 10-day extension of these four wiretaps, effective that day, on the basis of an affidavit that both incorporated the original July 5th affidavit and included information gathered through interceptions under the initial order. On August 1, the New Jersey court authorized a second 10-day extension of the initial order on the basis of an affidavit that again incorporated the earlier affidavits and set forth information gathered during prior interceptions. On August 11, 1977, the Prosecutor's Office sought and received a new order authorizing 20-day interceptions on the same four telephones. Again the supporting affidavit incorporated all previous affidavits and set forth new information gathered during previous interceptions.

█ On August 31, 1977, yet another 20-day order was issued.[8] Because service had

been terminated on one of the four tapped telephones, number 9462, no authorization was sought for continued interception of that line. However, the affidavit submitted to the New Jersey court by the Prosecutor's Office stated that new information had been obtained indicating that telephone number 6299 was emerging as a focal point for communications between the subjects of the investigation, and authorization was sought and received for the initiation of a wiretap on this number. On September 19, a 10-day extension was sought as to three of the four phones covered by the August 31 order,[9] and on September 29 a second extension was authorized covering these three lines.

No further orders or extensions were sought in connection with this investigation until January 3, 1978. A 20-day order issued on that date authorized the wiretapping of three previously untapped telephone lines, numbers 3016, 6656, and 7511. On January 23 a 10-day extension order was issued authorizing the continued interception of lines 3016 and 6656. After the expiration of this extension, all wiretap activity relevant to the instant appeals ceased. All intercepted conversations had been recorded on tape;[10] the wiretaps con-

---

8. Appellant Cortina argues that it was improper for the court to issue two consecutive 20-day orders without first authorizing two 10-day extensions of the earlier 20-day order. We are aware of no New Jersey case on point, but we see nothing in the New Jersey statute to support this proposition. Given that the standards governing the issuance of a 20-day order are *higher* than those pertaining to 10-day extensions, and given that the Prosecutor's Office met these stricter requirements, even assuming that the New Jersey courts would interpret the law in the manner suggested by Cortina, we fail to see how he could have been prejudiced by the challenged procedure. *See* N.J.Stat.Ann. 2A:156A–10(f), which states:

Upon consideration of an application, the judge may enter an ex parte order . . . authorizing the interception of a wire or oral communication, if the court determines on the basis of the facts submitted by the applicant that there is or was probable cause for belief that:

.  .  .  .  .

In the case of an application, other than a renewal or extension, for an order to intercept a communication of a person or on a

facility which was the subject of a previous order authorizing interception, the application is based upon new evidence or information different from and in addition to the evidence or information offered to support the prior order, regardless of whether such evidence was derived from prior interceptions or from other sources.

9. The affidavit supporting this application stated that "in order to minimize the interception of communications to the fullest extent possible," no extension was being requested to cover number 0027. Although drug-related conversations had been intercepted on line 0027, the Prosecutor's Office was of the opinion that no information regarding the particular activities on which the investigation had become focused would be lost by termination of the 0027 wiretap. Thus, the September 19 extension covered only numbers 5693, 5699 and 6299.

10. Both the federal statute and the New Jersey act require such recording. Section 2518(8)(a) of the federal statute provides in part:

The contents of any wire or oral communication intercepted by any means authorized by

ducted pursuant to the orders and extensions just enumerated generated over 200 reels of tape.

## II. *The Sealing of the Tapes*

The argument most vigorously pressed by all five appellants, and the only one requiring extended discussion, focuses on what happened *after* the intercepted conversations were recorded. Appellants contend that the government should not have been permitted to rely on any of the tapes recorded during the interceptions described above because unacceptable delays preceded the judicial sealing of these tapes.

Both the federal wiretap statute and the corresponding New Jersey statute require the "immediate" judicial sealing of tapes recorded in the course of a wiretap, and under the terms of both statutes the admissibility of such tapes into evidence is conditioned upon the presence of a judicial seal or the offer of a satisfactory explanation for its absence.[11] Federal and state courts have interpreted such sealing provisions to require, by implication, a satisfactory explanation even when a judicial seal is present, if such seal was not obtained "immediately." *See, e. g., United States v. Ricco,* 566

F.2d 433, 435 (2d Cir. 1977), *cert. denied,* 436 U.S. 926, 98 S.Ct. 2819, 56 L.Ed.2d 768 (1978); *United States v. Gigante,* 538 F.2d 502, 506 (2d Cir. 1976); *State v. Cerbo,* 78 N.J. 595, 600, 397 A.2d 671, 674 (1978). We have had occasion before to discuss the importance of the sealing provisions of the federal act.

> Congress, in enacting Title III's sharply detailed restrictions on electronic surveillance, intended to "ensure careful judicial scrutiny throughout" the process of intercepting and utilization of such evidence.
>
> . . .
>
> The immediate sealing and storage of recordings of intercepted conversations, under the supervision of a judge, is an integral part of this statutory scheme. Section 2518(8)(a) was intended to "insure that accurate records will be kept of intercepted communications". . . . Clearly all of the carefully planned strictures on the conduct of electronic surveillance . . . would be unavailing if no reliable records existed of the conversations which were, in fact, overheard.

*United States v. Gigante, supra,* 538 F.2d at 505 (citations omitted). *Gigante* held that where tapes have not been properly sealed,

---

this chapter shall, if possible, be recorded on tape or wire or other comparable device. Similarly, N.J.Stat.Ann. 2A:156A–14 provides in part:

> Any wire or oral communication intercepted in accordance with this act shall, if practicable, be recorded by tape, wire or other comparable method.

11. Section 2518(8)(a) of 18 U.S.C. provides in part:

> Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions. Custody of the recordings shall be wherever the judge orders. . . . Duplicate recordings may be made for use or disclosure pursuant to the provisions of subsections (1) and (2) of section 2517 of this chapter for investigations. The presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire or oral communication or evidence derived therefrom under subsection (3) of section 2517.

Section 2517(3) of 18 U.S.C. provides:

> Any person who has received, by any means authorized by this chapter, any information concerning a wire or oral communication, or evidence derived therefrom intercepted in accordance with the provisions of this chapter may disclose the contents of that communication or such derivative evidence while giving testimony under oath or affirmation in any proceeding held under the authority of the United States or of any State or political subdivision thereof.

Section 2A:156A–14 of the New Jersey Statutes provides in part:

> Immediately upon the expiration of the order or extensions or renewals thereof, the tapes, wires or other recordings shall be transferred to the judge issuing the order and sealed under his direction. Custody of the tapes, wires or other recordings shall be maintained wherever the court directs. . . . Duplicate tapes, wires or other recordings may be made for disclosure or use pursuant to . . . this act. The presence of the seal provided by this section, or a satisfactory explanation for its absence, shall be a prerequisite for the disclosure of the contents of any wire or oral communication, or evidence derived therefrom, under . . . this act.

suppression is appropriate even in the absence of any showing that the tapes have been altered. The Court reasoned that to condition suppression of improperly sealed tapes on a showing of tampering would controvert the language of the statute and would vitiate the congressional purpose. *But see United States v. Cohen*, 530 F.2d 43, 46 (5th Cir.), *cert. denied*, 429 U.S. 855, 97 S.Ct. 149, 50 L.Ed.2d 130 (1976); *United States v. Sklaroff*, 506 F.2d 837, 840 (5th Cir.), *cert. denied*, 423 U.S. 874, 96 S.Ct. 142, 46 L.Ed.2d 105 (1975); *United States v. Falcone*, 505 F.2d 478, 484 (3d Cir. 1974), *cert. denied*, 420 U.S. 955, 95 S.Ct. 1338, 43 L.Ed.2d 432 (1975).

The 208 tapes here at issue were judicially sealed in three groups. On September 13, one hundred fourteen reels were sealed; on October 17, an additional twenty-one reels were sealed; and on February 9, 1978,

the final seventy-three tapes were sealed by order of Judge Blake. The chronology of events crucial to our calculation of the sealing delays involved in this case is set out in a chart in the margin.[12]

The parties disagree not only as to whether the sealing delays incurred in this case were justified, they disagree as well as to how these delays are to be calculated. We note at the outset that the measurement of a particular sealing delay and the determination of whether that delay requires suppression of a wiretap tape otherwise admissible in a federal trial are matters of federal law.[13] *United States v. Sotomayor*, 592 F.2d 1219, 1223–26 (2d Cir.), *cert. denied*, —— U.S. ——, 99 S.Ct. 2842, 61 L.Ed.2d 286 (1979). *Cf. United States v. Turner*, 558 F.2d 46, 49 (2d Cir. 1977) ("This is a federal prosecution, and federal law determines whether suppression is appropri-

12.

| Phone Number | Subscriber | July 5, 1977 | July 22, 1977 | Aug. 1, 1977 | Aug. 11, 1977 | Aug. 31, 1977 | Sept. 19, 1977 |
|---|---|---|---|---|---|---|---|
| 0027 | J. Sanchez | ORDER #1 | First Extension | Second Extension | ORDER #2 | ORDER #3 | Termination * |
| 9462 | A. Gonzalez | ORDER #1 | First Extension | Second Extension | ORDER #2 | Termination | |
| 5693 | D. Nunez | ORDER #1 | First Extension | Second Extension | ORDER #2 | ORDER #3 | First Extension |
| 5699 | D. Nunez | ORDER #1 | First Extension | Second Extension | ORDER #2 | ORDER #3 | First Extension |
| 6299 | J. M. Gonzalez | | | | | ORDER #3 | First Extension |
| 6656 | O. Milian | | | | | | |
| 7511 | M. Docal | | | | | | |
| 3016 | J. L. Nunez | | | | | | |

CONTINUED

| Phone Number | Sept. 29, 1977 | Oct. 9, 1977 | Jan. 3, 1978 | Jan. 23, 1978 | Feb. 2, 1978 | Date of Sealing | Number of Days Between Termination and Sealing |
|---|---|---|---|---|---|---|---|
| 0027 | | | | | | 9/13/77 | [No delay] * |
| 9462 | | | | | | 9/13/77 | 13 |
| 5693 | Second Extension | Termination | | | | 9/13 & 10/17/77 | 8 |
| 5699 | Second Extension | Termination | | | | 9/13 & 10/17/77 | 8 |
| 6299 | Second Extension | Termination | | | | 10/17/77 | 8 |
| 6656 | | | ORDER #4 | Extension | Termination | 2/ 9/78 | 7 |
| 7511 | | | ORDER #4 | Termination | | 2/ 9/78 | [17] ** |
| 3016 | | | ORDER #4 | Extension | Termination | 2/ 9/78 | 7 |

* It appears from the record that surveillance on the 0027 line had ceased by September 13 although interception was authorized to continue until September 19. No tapes from the 0027 line were introduced at trial.

** No tapes from the 7511 line were introduced at trial, and the parties agree that the delay in the sealing of these tapes is not at issue.

13. We express no opinion as to how the New Jersey courts would measure the sealing delays involved in this case or whether they would view these delays as requiring suppression of the tapes.

ate."). Thus, tapes sealed in compliance with the federal standards are admissible in federal court regardless of whether under applicable state law the tapes have been properly sealed. Under federal law, sealing delays are to be measured from the termination date of the continuous period of interception of a given telephone, regardless of the number or length of judicial orders that have been issued to authorize that surveillance. *United States v. Scafidi,* 564 F.2d 633, 641 (2d Cir. 1977), *cert. denied,* 436 U.S. 903, 98 S.Ct. 2231, 56 L.Ed.2d 401 (1978); *United States v. Fury,* 554 F.2d 522, 533 (2d Cir.), *cert. denied,* 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977). Section 2518(5), which permits the issuance of 30-day orders and 30-day extensions, places no limit on the number of orders or extensions that may be issued to authorize continuation of a given interception, provided, of course, that all statutory conditions are met.[14] Therefore, the duration of "the period of the order, or extensions thereof," will depend in each case on the authorizing judge's determination of the length of time interception is justified. And it is only the "expiration" of this "period of the order, or extensions thereof," that triggers the sealing requirement of § 2518(8)(a).[15]

*Sotomayor* turned on the distinction "between procedures governing the interception of wiretap evidence and those governing the preservation of such evidence after interception for trial."[16] 592 F.2d at 1225.

---

**14.** 18 U.S.C. § 2518(5) provides:

No order entered under this section may authorize or approve the interception of any wire or oral communication for any period longer than is necessary to achieve the objective of the authorization, nor in any event longer than thirty days. Extensions of an order may be granted, but only upon application for an extension made in accordance with subsection (1) of this section and the court making the findings required by subsection (3) of this section. The period of extension shall be no longer than the authorizing judge deems necessary to achieve the purposes for which it was granted and in no event for longer than thirty days. Every order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter, and must terminate upon attainment of the authorized objective, or in any event in thirty days.

**15.** In interpreting the federal statute in this manner in *United States v. Fury,* this Court noted that Congress had clearly not chosen to institute a sealing procedure sufficiently rigorous to preclude *all* possibility of tampering. Viewing the common sense reading of the statute to require sealing only after the expiration of the second (and last) 30-day extension of a 30-day wiretap order issued by a New York judge, the Court explained:

There is, of course, some logic in the proposition that the purpose of the sealing provisions would be better served if the tapes were sealed every thirty days rather than at the end of ninety days. Carried to its ultimate conclusion, however, tampering with the tapes could only be guarded against if they were sealed by a judge at the end of each day. The statute does not require this. Whatever tampering could be done in ninety days could be done in thirty days. As a practical matter, sealing every thirty days would not be a significantly better safeguard than the system used [here].

*United States v. Fury,* 554 F.2d 522, 533 (2d Cir.), *cert. denied,* 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977).

**16.** *Sotomayor* involved four wiretaps authorized by New York state courts and carried out by New York law enforcement officers. The applicable New York statute, like the federal statute, permits the issuance in proper circumstances of 30-day orders and unlimited 30-day extensions. N.Y.Crim.Proc. §§ 700.30(7) and 700.40. However, in contrast to the federal statute, the New York statute, as interpreted by the state's highest court, calls for immediate sealing after *each* order *or* extension authorizing interception. *People v. Washington,* 46 N.Y.2d 116, 412 N.Y.S.2d 854, 385 N.E.2d 593 (1978). The *Sotomayor* Court held that because the tapes resulting from each tap were sealed within one day of the termination of the *last* order or extension authorizing that tap, the tapes would not be suppressed, despite the fact that under New York law many of the tapes had not been timely sealed. For example, one of the *Sotomayor* taps was initiated on September 22, 1976, and was terminated December 2, 1976. Extensions of the original order had been granted on October 22 and November 5. All tapes from this tap were sealed on December 2. Under New York law, the sealing obligation arose upon the expiration of the initial order *and* upon the expiration of each extension. Thus, tapes made pursuant to the initial order required sealing "immediately" as of October 22 under New York law but required

We believe that . . . in determining whether to admit a wiretap obtained by a state officer acting under a state court order issued pursuant to a state statute, [we are required] to apply only those more stringent state statutory requirements or standards that are designed to protect an individual's right of privacy, as distinguished from procedural rules that are essentially evidentiary in character.

   . . . Since a state's protection of privacy normally reflects principles central to its social and governmental order, our failure to respect its more stringent protection of privacy rights would not only violate principles of federalism, but encourage state and federal law enforcement officials to by-pass state law and to engage in federal forum-shopping . . . . On the other hand, rules pertaining to the admissibility of evidence are ordinarily governed by the law of the forum.

*Id.* (footnotes omitted). This reasoning dictates the same result in the instant case. The New Jersey courts have had little occasion to interpret the state wiretap statute, and we are aware of no case precisely on point. Whether the sealing obligation of the New Jersey statute is eventually interpreted as attaching upon the expiration of each separate order or extension, as in New York, or as attaching only upon the termination of the entire period of interception of a particular telephone, as in the federal courts, we must be guided by federal law in this area. In contrast to the federal act,[17] the New Jersey statute permits issuance only of 20-day orders and 10-day extensions.[18] Furthermore, under the New Jersey statute only two 10-day extensions of a particular 20-day order may be issued. To obtain authorization for the continuation of

a wiretap beyond the period covered by an order and the two permitted extensions thereof, law enforcement officials must apply for a new order. By setting the standards for issuance of a 20-day order higher than those governing issuance of a 10-day extension,[19] and by permitting the issuance of only two extensions of each order, the New Jersey legislature has established a method somewhat different from that chosen by Congress for protecting against unwarranted interceptions. Under *United States v. Sotomayor, supra,* 592 F.2d at 1223–26, this choice, insofar as it affects the validity of an order issued by a New Jersey judge, will be respected by the federal courts. However, New Jersey's policy choice regarding the authorization of continuous wiretaps cannot logically be viewed as affecting the approach to be taken by the federal courts in assessing the adequacy of the sealing of the tapes obtained in the course of those taps.

     We interpret the phrase "period of the order, or extensions thereof," in the sealing provision of the federal statute, § 2518(8)(a), to encompass a continuous authorized wiretap in its entirety, regardless of whether the judicial orders authorizing the initiation or continuation of the tap are denominated "orders," "extensions," "renewals," or "continuations." To interpret federal law otherwise would result in permitting the timeliness of the sealing of tapes offered in evidence in federal court to be determined by a state decision to label orders authorizing the continuation of wiretaps by any term other than the term "extension." Such a result, although in no way increasing the protection afforded individual privacy, would diminish federal control over evidentiary procedures in the federal courts. Keeping in mind the principles

---

sealing "immediately" as of December 2 under federal law.

   As an alternative ground for its decision the *Sotomayor* Court noted that retroactive application of the New York case authoritatively construing the state statute would not be appropriate. *United States v. Sotomayor,* 592 F.2d 1219, 1226–27 (2d Cir. 1979), *citing People v. Washington, supra.*

**17.** As noted above, the federal statute permits issuance of 30-day orders and unlimited 30-day extensions, where appropriate. 18 U.S.C. § 2518(5), quoted in note 14, *supra.*

**18.** N.J.Stat.Ann. 2A:156A–12(f).

**19.** N.J.Stat.Ann. 2A:156A–10(f). *See* note 8, *supra.*

enunciated in *United States v. Sotomayor, supra,* we deem it most unlikely that Congress intended such a result. Therefore, we conclude that the term "extensions," as used in the phrase "period of the order, or extensions thereof" is to be understood in a common sense fashion as encompassing all consecutive continuations of a wiretap order, however designated, where the surveillance involves the same telephone, the same premises, the same crimes, and substantially the same persons. *See United States v. Scafidi, supra,* 564 F.2d at 641; *cf. United States v. Principie,* 531 F.2d 1132, 1142 n.14 (2d Cir. 1976), *cert. denied,* 430 U.S. 905, 97 S.Ct. 1173, 51 L.Ed.2d 581 (1977). It follows that the sealing obligation under federal law is not accelerated by New Jersey's method of authorizing the continuation of a wiretap beyond the period of the initial order.

■ Having determined that the sealing obligation attached, under federal law, on the date each tap terminated, we can now calculate how long the sealing of the eight sets of tapes generated by the eight wiretaps was delayed.[20] The delays relevant to this appeal range from 7 to 13 days:

| Wiretap | Date of Termination[21] | Dates of Sealing[22] | Days of Delay |
|---------|------------------------|----------------------|---------------|
| * 0027  | Sept. 19, 1977         | 9/13/77              | [0]           |
| 9462    | Aug. 31, 1977          | 9/13/77              | 13            |
| 5693    | Oct. 9, 1977           | 9/13 & 10/17/77      | 8             |
| 5699    | Oct. 9, 1977           | 9/13 & 10/17/77      | 8             |
| 6299    | Oct. 9, 1977           | 10/17/77             | 8             |
| 6656    | Feb. 2, 1978           | 2/ 9/78              | 7             |
| * 7511  | Jan. 23, 1978          | 2/ 9/78              | [17]          |
| 3016    | Feb. 2, 1978           | 2/ 9/78              | 7             |

*As explained in note 12, *supra,* the delays in sealing the 0027 and 7511 tapes are not at issue here.

■ The law is clear that if no explanation had been offered for these delays we would be obliged to reverse, as a sealing achieved one to two weeks after expiration of a wiretap cannot be considered "immediate." *Cf. United States v. Gigante, supra,* 538 F.2d 502 (8 to 12 month delays). The cases illustrate that sealing is often possible within one or two days. *See, e. g., United States v. Sotomayor, supra,* 592 F.2d at 1221. Thus, in our view, any delay beyond that certainly calls for explanation. Unfortunately, there is no clear consensus as to what constitutes a "satisfactory explanation," under the statute, for a less-than-immediate sealing.

■ No evidence was offered to controvert the affidavit submitted by the govern-

20. We reject the government's argument, apparently accepted by Judge Mishler, that the attempted unilateral "sealing" of the tapes by the investigators themselves, outside the presence of the court, can satisfy the statutory command that the tapes "be made available to the judge . . . and sealed under his directions." Although certainly all reasonable precautions against tampering should be taken both before and after judicial sealing is accomplished, *see, e. g., United States v. DePalma,* 461 F.Supp. 800, 826–29 (S.D.N.Y.1978), such procedures do not substitute for the presence of a "seal *provided for by this subsection.*" 18 U.S.C. § 2518(8)(a) (emphasis added).

21. There is no dispute between the parties concerning the dates on which the various wiretaps were terminated. Thus, we need not address the important question of how sealing delays are to be calculated in those cases where, pursuant to the minimization requirements of the governing statute, a tap is terminated before the expiration of the maximum period of interception authorized by the final order issued in regard to that tap. Although this was the case with line 0027, appellants do not claim that this wiretap was terminated pri-

or to the day of sealing. In any case, no tapes from this line were introduced at trial. *Compare United States v. Principie,* 531 F.2d 1132, 1142 (2d Cir. 1976), *cert. denied,* 430 U.S. 905, 97 S.Ct. 1173, 51 L.Ed.2d 581 (1977) (discussing notification provision, § 2518(8)(d)), *with United States v. Ricco,* 421 F.Supp. 401, 406–07 (S.D.N.Y.1976), *aff'd,* 566 F.2d 433 (2d Cir. 1977), *cert. denied,* 436 U.S. 926, 98 S.Ct. 2819, 56 L.Ed.2d 768 (1978).

22. In some instances, tapes generated by the same wiretap were sealed at different times. In our view, the government's decision to obtain judicial sealing of some tapes *prior* to termination of the relevant tap did not accelerate its obligation to obtain sealing of the remainder of the tapes. A contrary ruling would needlessly discourage the government from exceeding the minimal standards set by the statute in those instances where it could otherwise do so. *Cf. United States v. Fury, supra,* 554 F.2d at 533 ("[S]ince it would not be a hardship for the government to seal the tapes after each [order or extension], it might seriously consider adopting such a practice.")

ment at the suppression hearing or the testimony of task force agents at trial regarding the carrying out of the wiretapping. The task force experienced shortages in both qualified personnel and equipment. Surveillance on each wire was conducted 24 hours a day and as many as five lines were monitored at any given time. Because the great majority of the conversations intercepted were conducted in Spanish, it was necessary, in order to observe the minimization requirements of the New Jersey statute,[23] to have at least one agent fluent in Spanish monitoring the tapes on each 8–12 hour shift. Although the Prosecutor's Office borrowed Spanish-speaking agents from other law enforcement agencies, only four qualified agents were available. An attempt was made to record both original tapes and duplicate tapes simultaneously but because too few tape recorders were available, even after borrowing, this was possible less than half the time. Due to round-the-clock use, the tape recorders required frequent repair work. Further, because personnel and equipment were engaged in the monitoring and recording process, machines and personnel were not always available to duplicate those tapes for which no duplicates had been made during the interception itself. And because the Spanish speaking personnel were engaged in monitoring conversations, they were not always available to spot-check the duplicate tapes for audibility. In addition, during the effective period of each order or extension, strike force personnel needed to gain sufficient familiarity with the tapes to enable them to decide which taps should be continued and which should be terminated.[24] Each application for continued authorization of a tap contained information obtained during the effective period of the prior order or extension so that the issuing judge

would have sufficient information on which to base a determination that continued surveillance was justified. This on-going evaluation of the conversations intercepted made further demands on the personnel and equipment available. Finally, the fact that over 200 reels of tape required duplicating, labeling, and checking made difficult the prompt preparation of the tapes for sealing.

Although the question is close, in our view the circumstances just detailed provide a satisfactory explanation for the 7 to 13 day sealing delays. When the wiretaps were first instituted, the government had reason to believe that the investigation would be quickly concluded, as their information indicated that a drug shipment was due to arrive in the area. Had the evidence needed been gathered during the first week or two of surveillance, perhaps the personnel and equipment on which the project depended would have been able to handle the necessary monitoring, duplication and transcription without incurring delays in sealing. In the circumstances of this case, where we discern on the government's part no bad faith, no lack of diligence, and no attempt to gain an advantage over the defendants, we believe that the government's lack of foresight regarding the actual scope of the investigation does not justify the exclusion of probative evidence lawfully obtained.

Congress has explicitly established "two possible prerequisites to the use of wiretap evidence—the presence of a judicial seal, *or* a satisfactory explanation of its absence . . . ." *United States v. Gigante, supra,* 538 F.2d at 506 (emphasis added). Unless we are to read the second alternative out of the statute, we must decide in each case whether the explanation tendered can be deemed "satisfactory." In the instant case,

---

**23.** Section 2A:156A–12 of the New Jersey statute provides in part:

Every order entered under this section shall require that such interception begin and terminate as soon as practicable and be conducted in such a manner as to minimize or eliminate the interception of such communications not otherwise subject to interception under this act.

**24.** That the obligation to discontinue non-essential taps was recognized and respected is evidenced by the fact that the Prosecutor's Office on its own initiative terminated the 0027 tap several weeks before the close of the initial phase of the investigation. Similarly, no extension was sought for the 7511 tap during the final phase. *See* note 12, *supra.*

although the delays were not miniscule, neither were they of *Gigante* proportions. In this Circuit delays of comparable length have been deemed excusable in some circumstances and inexcusable in others. *Compare United States v. Scafidi, supra,* 564 F.2d 633 (7-day delay excused); *United States v. Fury, supra,* 554 F.2d at 533 (6-day delay excused); *United States v. Poeta,* 455 F.2d 117 (2d Cir.), *cert. denied,* 406 U.S. 948, 92 S.Ct. 2041, 32 L.Ed.2d 337 (1972) (13-day delay excused); *United States v. Aloi,* 449 F.Supp. 698 (E.D.N.Y.1977) (5-day and 7-day delays excused); *United States v. Caruso,* 415 F.Supp. 847 (S.D.N.Y.1976), *aff'd,* 553 F.2d 94 (2d Cir. 1977) (24-day and 42-day delays excused) *with United States v. Ricco,* 421 F.Supp. 401 (S.D.N.Y.1976), *aff'd,* 566 F.2d 433 (2d Cir. 1977), *cert. denied,* 436 U.S. 926, 98 S.Ct. 2819, 56 L.Ed.2d 768 (1978) (pre-*Sotomayor,* applying New York law, 12-day or 13-day delay not excused). *See also United States v. Angelini,* 565 F.2d 469 (7th Cir. 1977), *cert. denied,* 435 U.S. 923, 98 S.Ct. 1487, 55 L.Ed.2d 517 (1978) (9-day, 26-day and 38-day delays excused); *United States v. Sklaroff, supra,* 506 F.2d 837. Taken together, the factors discussed above appear to us to explain adequately the delays incurred.[25]

However, in law as in life, today's satisfactory explanation may very well be tomorrow's lame excuse. As the federal and state case law in this area grows, the failure to foresee and, where possible, prevent

sealing delays becomes less justifiable, as law enforcement officials must be expected to learn from their own experiences and those of others. As other courts have done: "We decline to allow the police to rely on their own failure to use proper equipment or to institute more efficient procedures as an excuse for delay." *People v. Washington,* 46 N.Y.2d 116, 124, 412 N.Y.S.2d 854, 859, 385 N.E.2d 593, 597 (1978). The wiretapping statute imposes a duty on the judiciary as well as on the prosecutor. It is our role to exclude from evidence tapes not sealed in conformance with the law, and we are aware that by faithfully performing this statutory duty we encourage law enforcement officers to perform their duties in an equally rigorous manner. For this reason, we will continue to scrutinize wiretap cases with care, and will not hesitate to exclude evidence when exclusion is appropriate.

### III. *Probable Cause*

Not only do appellants contend that the wiretap tapes were improperly sealed, they argue, in addition, that this evidence was improperly obtained. Appellants claim that the affidavits supporting the wiretap authorization orders failed to establish probable cause for the interceptions and that Judge Mishler erred in denying defense motions to suppress the tapes on this ground.

The New Jersey statute[26] permits a state judge to enter an *ex parte* intercep-

---

25. We fail to see the relevance of an additional factor relied on by the government in attempting to explain the sealing delays. The absence of the judge in mid-August has little bearing on delays which occurred in September and later months. In addition, after *United States v. Poeta,* 455 F.2d 117 (2d Cir.), *cert. denied,* 406 U.S. 948, 92 S.Ct. 2041, 32 L.Ed.2d 337 (1972), and *United States v. Fury, supra,* 554 F.2d 522, it should be clear that in the courts of this Circuit, tapes sealed by a judge other than the "issuing judge," because of the absence or unavailability of the latter, are considered properly sealed.

26. The adequacy of the warrant applications must be tested against both federal and applicable state law. *United States v. Sotomayor, supra,* 592 F.2d at 1225 and n.13. Although there is a paucity of case law interpreting the New Jersey statute, what there is suggests that

we may draw on the many cases interpreting the almost identical federal act which permits issuance of a wiretap order, when, *inter alia,*

(a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in . . . this chapter;

(b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;

. . . . .

(d) there is probable cause for belief that the facilities from which, or the place where, the wire or oral communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

tion order if the court determines on the basis of the facts submitted by the applicant that there is probable cause to believe *inter alia* that:

(a) The person whose communication is to be intercepted is engaging or was engaged over a period of time as a part of a continuing criminal activity or is committing, has or had committed or is about to commit an offense as provided in . . . this act;

(b) Particular communications concerning such offense may be obtained through such interception;

.     .     .     .     .

(d) The facilities from which, or the place where, the wire or oral communications are to be intercepted, are or have been used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by, such individual . . . .

N.J.Stat.Ann. 2A:156A–10. We are not the first court that has been called upon to evaluate the challenged affidavits under the statutory standards. A neutral and detached magistrate, Judge Blake of the New Jersey Superior Court, concluded that these affidavits established probable cause for his issuance of the several orders requested, and such a determination is to be accorded substantial deference. *Aguilar v. Texas,* 378 U.S. 108, 111, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *United States v. Gomez Londono,* 553 F.2d 805, 810 (2d Cir. 1971); *State v. Murphy,* 137 N.J.Super. 404, 420, 349 A.2d 122, 131 (Super.Ct.Law Div.1975), *rev'd on other grounds,* 148 N.J.Super. 542, 372 A.2d 1315 (Super.Ct.App.Div.1977). Judge Mishler has also carefully reviewed the challenged affidavits and has found them to be more than adequate. Our own study of the affidavits leads us to the same conclusion.

No purpose would be served by setting out in detail the contents of these lengthy affidavits. Suffice it to say that each one provided ample factual material on which to base a determination of probable cause. The information presented in the initial 37-page affidavit was gathered from several sources, including tips from three confidential informants. Considerable evidence was provided to support the affiant's conclusion that the informants were reliable. Two had previously supplied the Prosecutor's Office with information concerning drug-related activity and this information had been corroborated by the investigators and found to be correct. *See Aguilar v. Texas, supra; Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *United States v. Rueda,* 549 F.2d 865, 870 (2d Cir. 1977); *United States v. Edmonds,* 535 F.2d 714 (2d Cir. 1976); *United States v. Fantuzzi,* 463 F.2d 683, 687–88 (2d Cir. 1972). *Cf. United States v. Fiorella,* 468 F.2d 688, 691–92 (2d Cir. 1972), *cert. denied,* 417 U.S. 917, 94 S.Ct. 2622, 41 L.Ed.2d 222 (1974). The information given by the third informant was confirmed by a DEA agent. Significantly, the statements provided by the confidential informants to some extent corroborated one another. Furthermore, the Prosecutor's Office had, where possible, verified details of the informants' stories in order to ensure that the tips were based "on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation." *Spinelli v. United States,* 393 U.S. 410, 416, 89 S.Ct. 584, 589, 21 L.Ed.2d 637 (1969); *United States v. Edmonds, supra,* 535 F.2d at 720. *Cf. United States v. Dunloy,* 584 F.2d 6 (2d Cir. 1978). Although some of the information had been gathered in the early stages of the investigation, there was ample indication that the criminal activity was of an ongoing nature and

---

18 U.S.C. § 2518(3). *Cf. State v. Sanchez,* 149 N.J.Super. 381, 394, 396–97, 373 A.2d 1028, 1034, 1035 (Super.Ct.Law Div.1977) (drawing on federal cases in interpreting notice provision of New Jersey statute; "[t]he New Jersey wiretap statute is closely modeled after the federal statute;" although the New Jersey act contains

"a significant number of specific additional requirements beyond those embodied in the federal wiretap statute, this court finds that they do not negate the stated intent of the Legislature to generally pattern the New Jersey statute on the federal standards and safeguards incorporated in 18 U.S.C. [ ] § 2518(1) *et seq.*").

that the information was therefore still pertinent. *State v. Murphy, supra,* 137 N.J.Super. at 421; 349 A.2d at 131–32. Moreover, appellants' contention that the affidavit was defective due to certain omissions is without merit. We agree with Judge Mishler that assuming that the omitted facts are true and that their omission was intentional, they would not be material to a determination of probable cause. Therefore no hearing on this issue was necessary.[27] *Cf. Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); *United States v. Steinberg,* 525 F.2d 1126, 1131 (2d Cir. 1975), *cert. denied,* 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976). Viewed as a whole, the initial affidavit was sufficient to establish probable cause to believe that by tapping the target phones investigators could intercept communications between the members of the alleged drug conspiracy and that those conversations would relate to that conspiracy. The subsequent affidavits, all of which incorporated new information gleaned during the most recent interceptions, also clearly met the standard set by statute.[28]

▮ Defendants correctly observe that wiretapping is "not to be routinely employed as the initial step in criminal investigation," *United States v. Giordano,* 416 U.S. 505, 515, 94 S.Ct. 1820, 1827, 40 L.Ed.2d 341 (1974). The New Jersey statute provides that a wiretap application shall include, in addition to the requirements just discussed:

> A particular statement of facts showing that other normal investigative procedures with respect to the offense have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous to employ . . . .

N.J.Stat.Ann. 2A:156A–9(c)(6).[29] However, "the purpose of the statutory requirements is not to preclude resort to electronic surveillance until after all other possible means of investigation have been exhausted by investigative agents; rather, they only require that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods." *United States v. Hinton,* 543 F.2d 1002, 1011 (2d Cir.), *cert. denied,* 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976). *See also United States v. Fury, supra,* 554 F.2d at 529–30; *United States v. Steinberg, supra,* 525 F.2d at 1130. The challenged affidavits were clearly sufficient in this regard. As Judge Mishler stated:

> The affidavit details the standard investigative techniques that were utilized prior to the wiretap application and indicates the paucity of admissible evidence resulting therefrom.

Prior to resorting to wiretapping, the Prosecutor's Office had interviewed informants, both confidential and identified; had undertaken physical surveillance; and had checked bank, telephone, motor vehicle, public utilities and police records; and yet, had been unable to gather sufficient evidence to arrest the conspirators.

The district court correctly concluded that the challenged wiretap orders were properly issued.

The judgments of conviction are affirmed.

---

27. For the same reason we must reject Cortina's challenge to the search warrant pursuant to which incriminating evidence, later introduced at trial, was seized from his New York apartment.

28. *See* N.J.Stat.Ann. 2A:156A–10(f), quoted in note 8, *supra.*

29. Compare the federal requirement that an application show that:

> normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous . . . .

18 U.S.C. § 2518(3)(c).