**UNITED STATES of America,
Appellee,**

v.

**James BEST, Defendant–Appellant.
Docket Nos. 99–1646(L), 99–1688**

United States Court of Appeals,
Second Circuit.

Argued: May 12, 2000

Decided: July 25, 2000

Steven D. Clymer, Assistant United States Attorney, Syracuse, New York (Daniel J. French, United States Attorney for the Northern District of New York, Syracuse, New York, on the brief), for Appellee.

Brown, Pinnisi & Michaels, Ithaca, New York (Michael D. Pinnisi, Peter M. Stein, Ithaca, New York, of counsel), filed a brief for Defendant-Appellant.

Before: KEARSE, CARDAMONE, and WALKER, Circuit Judges.

KEARSE, Circuit Judge:

Defendant James Best appeals from a judgment of conviction entered in the United States District Court for the Northern District of New York following a jury trial before Thomas J. McAvoy, then-*Chief Judge,* convicting him of aiding and abetting a fraud against the United States, in violation of 18 U.S.C. §§ 1031 and 2, and sentencing him principally to three years' probation. On appeal, Best contends (1) that the trial court improperly admitted in evidence a codefendant's out-of-court statement that the codefendant intended to ask Best to create a fraudulent document, (2) that the evidence was insufficient to support his conviction, and (3) that he received ineffective assistance of counsel. Finding no merit in his contentions, we affirm.

## I. BACKGROUND

The present prosecution of Best and his codefendant Jerome Maciejewski arose out of the 1992 operations of WholeHealth Insurance Network, Inc. ("WIN" or the "Company"), a private insurance company in New York State that had a contract with the United States Health Care Financing Administration ("HCFA"), which administers the Medicare program. WIN's contract with HCFA ("the Medicare contract") called for WIN to process certain Medicare claims, respond to beneficiary and provider requests for information, and deal with requests for reviews and hearings. The contract prohibited WIN from using Medicare funds for its private business costs.

In a six-count indictment, Maciejewski was charged principally with causing fraudulent claims to be submitted to HCFA at various times in 1992; Best was charged in one count with aiding and abetting the submission of such fraudulent claims beginning in May 1992. Best and Maciejewski were tried jointly, and each defendant was convicted on the counts against him. Only Best's conviction is at issue on this appeal. The evidence at trial, taken in the light most favorable to the government, showed the following.

WIN's operations were divided among three divisions, headquartered respectively in Albany, Buffalo, and Binghamton. Each division had a "professional relations" department that served as a liaison between the Company and the health care providers who submitted claims for reimbursement. WIN's Medicare business was handled in its Binghamton division, which was also known as its "Upstate Medicare Division"; the Company's Albany and Buffalo divisions were involved only in private insurance, not Medicare. The employees in the Albany division's professional relations department were not trained to do Medicare-related work and did not do such work. Best was a senior vice president of the Company and was chief operating officer of the Albany division.

In April 1992, Maciejewski became the Company's chief operating officer, with responsibility for all three divisions. Because WIN was having serious financial difficulties, Maciejewski began to cut corporate costs and sought other sources of funds, including increased payments from HCFA.

Evidence as to Maciejewski's plans for obtaining increased payments from HCFA was introduced at trial largely through the testimony of Robert Gastle, an employee in the Company's finance department who was responsible for the Company's Medicare budgeting and reporting process. In that capacity, Gastle reported to Martin Benz, who reported to David Voss, the Company's vice president of finance. Gastle testified that in May 1992, Maciejewski instructed him to inform Voss that Maciejewski wanted 50 percent of the expenses of the Buffalo division's professional relations department to be reallocated to Medicare, retroactively to January 1992. As a result of such an increased allocation, the Buffalo division would receive more money from HCFA on the Medicare contract, which would help fund WIN's non-

Medicare expenses. Maciejewski said he would have the Buffalo professional relations representatives distribute Medicare materials at meetings with the western New York provider community in order to justify the allocation; but he did not indicate that the representatives had been making such distributions since January 1992, and in Gastle's view such distributions could not justify allocating 50 percent of that department's expenses to the Medicare contract.

Gastle relayed Maciejewski's instructions to Voss, but Voss balked at carrying them out unless they were in writing. When Gastle reported Voss's response to Maciejewski, Maciejewski called Voss "wimpy" and expressed displeasure at being forced to put his instructions in writing. The government introduced evidence that Maciejewski nonetheless promptly prepared a Medicare reallocation memorandum to Voss, instructing that 50 percent of the Buffalo division's professional relations department expenses be reallocated to the Medicare contract, retroactively to January 1, 1992. Maciejewski's secretary testified that she typed the memorandum to Voss, at Maciejewski's request, on May 6, 1992. The memorandum was backdated to February 3, 1992, and was apparently received by Voss on June 3, 1992; however, the secretary testified that the word-processing program she used showed that the document was generated on May 6. Maciejewski's memorandum stated as follows:

> As you know, we have recently discussed the Professional Relations (PR) activity that Buffalo is performing for our Medicare division. With this in mind, it seems reasonable to allocate 50 percent of the PR cost centers to the Medicare division. This activity was reinstituted on January 1, 1992, therefore, this allocation should be retroactive to that date.
>
> If you have any questions, please contact me.

(Memorandum from Jerry Maciejewski to David Voss, dated "February 3, 1992.")

Over Best's objection, Gastle further testified that when he reported to Maciejewski Voss's refusal to implement the Medicare reallocation without written instructions, "Mr. Maciejewski told [Gastle] that he would call Albany and talk to Jim and take care of it with the Albany division" (Transcript ("Tr."), at 689). The government introduced evidence that Maciejewski and James Best were friends; that beginning on or about May 13, Maciejewski attended a series of meetings with Best in Albany and had daily contact with him; and that sometime between May 13 and May 15, Best wrote Voss instructing that 50 percent of the Albany division's professional relations department expenses be reallocated to the Medicare contract, retroactively to January 1, 1992. Although Best's Medicare reallocation memorandum was backdated to February 18, 1992, Voss received it on May 15. Best's secretary testified that Best had asked her to type the memorandum during the second week of May; and Best testified that he wrote the memorandum within a day or two of his May meetings with Maciejewski. The Best memorandum stated as follows:

> Per this morning's conversation, please make the necessary adjustment in the cost allocation system to properly credit this department for its Medicare involvement. Since the first of the year, Jerry Maciejewski has asked us to assist the Medicare B Operation by having our Professional Relations Representatives disseminate various medicare information to our providers when they are making routine provider contacts and calls.
>
> Therefore, would you please allocate 50% of the Department to the Binghamton Division retroactive to January 1, 1992.

(Memorandum from James W. Best to David Voss, dated "February 18, 1992.")

In June 1992, following the instructions received in the Maciejewski and Best

memoranda, Gastle had the documentation prepared and made the journal entries necessary to implement the retroactive increases in the Medicare contract allocations. As a result of the change in allocation, a total of $459,992 of WIN's professional relations costs for the two non-Medicare divisions was falsely allocated to the Medicare contract between January and September 1992, including $164,780 for the Albany division, for which Best was responsible.

Best testified at trial in his own defense. While acknowledging that it would have been improper to order the reallocation of Albany division expenses to the Medicare contract unless its employees were actually doing Medicare work, Best stated that he believed at the time he wrote the memorandum that the professional relations employees in the Albany division were in fact doing Medicare work. Further, Best denied ever having discussed the Medicare contract allocation with Maciejewski. He testified that he had sent his memorandum to Voss because he was instructed to do so by Voss. He testified that Voss told him to send the memorandum, Voss provided the language, and Voss instructed him to backdate it. Best also stated that he had believed Voss was involved in manipulating financial data used to determine insurance rates; but, Best testified, he had "[a]bsolutely" complied with Voss's instructions without question. (Tr. 2196–97.) Best conceded that, in the Company hierarchy, he was senior to Voss.

The jury returned a verdict of guilty. The district court denied motions by Best for a judgment of acquittal and imposed a sentence of probation as indicated above. This appeal followed.

## II. DISCUSSION

On appeal, Best contends principally (1) that the trial court improperly allowed Gastle to testify that Maciejewski said he intended to ask Best to send Voss a Medicare reallocation memorandum for the Albany division, and (2) that the evidence as

to his knowledge of Maciejewski's scheme to defraud the government was insufficient to support his conviction of aiding and abetting. Best also contends that his Sixth Amendment right to effective assistance of counsel was violated by his counsel's performance. Finding no merit in his contentions, we affirm the judgment.

### A. *Maciejewski's Statement of Intent To Call Best*

■ The government informed defense counsel prior to trial of its intent to offer in evidence Gastle's testimony that in May 1992 Maciejewski had stated that he would speak to Best about instructing Voss to make reallocations to the Medicare contract for professional relations department expenses of the Albany division. The government argued that Maciejewski's statement expressed an intent to perform a future act and thus fell within the exception to the hearsay rule set out in Fed. R.Evid. 803(3) ("statement of the declarant's then existing . . . intent" is not excluded by the hearsay rule). Best argued that Maciejewski's statement should not be admitted against Best, arguing that

> the only time that you can use 803(3) against a nondeclarant . . . is if there is independent evidence corroborating that the intent actually took place. For example, if they say I'm going to have a meeting with so and so. There has to be eyewitnesses that the meeting later took place if they want to use that statement against a co-defendant who is a nondeclarant.

(Tr. 5.) Best argued that "the only connection" between Best and Maciejewski "is going to be this phone call," in which "anything could have been discussed," and that there would be insufficient corroboration to permit introduction against Best of Maciejewski's statement of intent to call Best. (Tr. 9.) The government argued that the statement was admissible against Best not to show conduct by Best, but rather to show that Maciejewski proceeded to speak

to Best as Maciejewski had told Gastle he would; the government argued that there was sufficient independent evidence of Best's own conduct that corroborated the proposition that Maciejewski had indeed followed through on his intent to speak to Best with regard to the fraudulent allocations.

Following that pretrial colloquy, the district court reserved decision. During the trial, the court concluded that the Gastle testimony as to Maciejewski's statement of intent to call Best was sufficiently corroborated and hence would be admitted:

> [Best's memorandum] contained substantially the same information that the Maciejewski memoranda contained. It was backdated to the same time. It was issued contemporaneous, almost with the time the statement was alleged to be made. So the Court thinks that's sufficient corroborative evidence to ... allow to be admitted against Best. There has to be corroborative evidence. That's clear. The Court thinks that's sufficient.

(Tr. 328.)

In challenging this ruling, Best contends that the statement was improperly offered to prove his conduct and intent, that there was insufficient corroboration of the statement, and that the court's view of the timing of the Best and Maciejewski memoranda was mistaken. We disagree.

■ A declarant's out-of-court statement as to his intent to perform a certain act in the future is not excludable on hearsay grounds. *See* Fed.R.Evid. 803(3) ("[a] statement of the declarant's then existing state of mind ... such as intent" is "not excluded by the hearsay rule"). If relevant, such a statement may be introduced to prove that the declarant thereafter acted in accordance with the stated intent. *See, e.g., Mutual Life Insurance Co. v. Hillmon*, 145 U.S. 285, 295–96, 12 S.Ct. 909, 36 L.Ed. 706 (1892); *see also* Fed. R.Evid. 803 Advisory Committee Note to Paragraph (3) (1972) ("The rule of *Mutual*

*Life Ins. Co. v. Hillmon*, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706, ... allowing evidence of intention as tending to prove the doing of the act intended, is ... left undisturbed.").

In several cases, this Court has discussed whether a declarant's out-of-court statement of intent was admissible in evidence against a person other than the declarant. *See, e.g., United States v. Delvecchio*, 816 F.2d 859, 863 (2d Cir.1987); *United States v. Nersesian*, 824 F.2d 1294, 1325 (2d Cir.), *cert. denied*, 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987); *United States v. Badalamenti*, 794 F.2d 821, 825–26 (2d Cir.1986); *United States v. Sperling*, 726 F.2d 69, 73–74 (2d Cir.), *cert. denied*, 467 U.S. 1243, 104 S.Ct. 3516, 82 L.Ed.2d 824 (1984); *United States v. Cicale*, 691 F.2d 95, 103 (2d Cir.1982), *cert. denied*, 460 U.S. 1082, 103 S.Ct. 1771, 76 L.Ed.2d 344 (1983). In each of these cases, we concluded that admissibility turned on whether there was independent evidence that connected the declarant's statement with the non-declarant's activities.

In *United States v. Cicale*, for example, the declarant on several occasions told an undercover agent that he was about to meet with his drug "source," to whom he never referred by name, at specific locations such as "the guy's house" or "at the restaurant where he's at" "right now." 691 F.2d at 103 n. 2. Soon after each such statement, the declarant was either seen with Cicale or seen arriving at Cicale's home. *See* 691 F.2d at 103. We concluded that the observations of Cicale meeting with the declarant promptly after the declarant stated he was about to meet with his "source" were independent evidence that Cicale was the "source" referred to by the declarant and that Cicale had engaged in narcotics trafficking.

Following the reasoning of *Cicale*, we held in *United States v. Sperling* that a declarant's statement that she was going to meet with her drug source at noon that day was admissible to prove Sperling's

participation in a drug conspiracy where law enforcement agents observed Sperling meeting with the declarant at the appointed time, and no one else met with the declarant from 11:30 a.m. to 2 p.m. *See* 726 F.2d at 73–74. In *United States v. Delvecchio*, an informant stated that he was going to meet with defendants Delvecchio and Amen to set up a drug transaction. A meeting ensued, and law enforcement agents observed Amen drive to the meeting site and get out of the car and approach the informant. However, the passenger in the car never got out and the agents could not see his face. We held that the informant's statement was not admissible to prove that Delvecchio attended the meeting because there was no independent evidence that he had done so.

■ Corroboration of the nature of the transaction need not be eyewitness observations and may be provided by circumstantial evidence. Thus, in *United States v. Badalamenti*, the declarant stated that he would meet the defendant at a particular time and place to obtain a heroin sample; we held that there was sufficient corroboration to admit that statement against the defendant in light of the government's evidence that the defendant met the declarant at the location specified in the declarant's statement and that after the meeting, the declarant had samples of heroin. *See* 794 F.2d at 825–26.

In the present case, there was ample circumstantial evidence to corroborate the proposition that Best was the person Maciejewski said he would ask to prepare a Medicare reallocation memorandum for the Company's Albany division. Best's name is James, and Maciejewski said he would call "Jim"; Best and Maciejewski were friends, permitting the inference that it was not improbable that Maciejewski would refer to Best by nickname; and Maciejewski said he would have "Jim" take care of the matter with respect to the Albany division, and Best was in charge of the Albany division.

There was also ample independent proof that Maciejewski thereafter made such a request of Best. The record included evidence that Maciejewski made his statement to Gastle in early May; that Maciejewski thereafter wrote a memorandum on May 6 instructing Voss to make the fraudulent reallocations with respect to the Buffalo division; that on May 13, Maciejewski met with Best; and that Best, within a day or two of meeting with Maciejewski, wrote a memorandum to Voss with respect to the Albany division that was in substance identical to the memorandum written by Maciejewski. Best's conduct was proven not by Maciejewski's statement of what he would ask Best to do, but rather by the direct evidence of what Best did. We see no error in the district court's admission of Maciejewski's statement against Best.

### B. *Sufficiency of the Evidence*

■ To convict a defendant on a theory of aiding and abetting, the government must prove that the underlying crime was committed by a person other than the defendant and that the defendant acted—or failed to act in a way that the law required him to act—with the specific purpose of bringing about the underlying crime. *See, e.g., United States v. Labat*, 905 F.2d 18, 23 (2d Cir.1990); *United States v. Wiley*, 846 F.2d 150, 154 (2d Cir.1988); *United States v. Zambrano*, 776 F.2d 1091, 1097 (2d Cir.1985). To prove that the defendant acted with that specific intent, the government must show that he knew of the proposed crime. *See, e.g., United States v. Pipola*, 83 F.3d 556, 562 (2d Cir.), *cert. denied*, 519 U.S. 869, 117 S.Ct. 183, 136 L.Ed.2d 122 (1996); *United States v. Di Stefano*, 555 F.2d 1094, 1103 (2d Cir.1977); *United States v. Gallishaw*, 428 F.2d 760, 763 (2d Cir.1970); *see also Nye & Nissen v. United States*, 336 U.S. 613, 620, 69 S.Ct. 766, 93 L.Ed. 919 (1949) (aiding and abetting theory supports liability when the defendant "consciously shares in" the underlying criminal act). To be culpable, the defendant need not know all of the details of the crime, *see, e.g., United*

*States v. Grubczak,* 793 F.2d 458, 463 (2d Cir.1986), if the evidence shows that he "joined the venture, shared in it, and that his efforts contributed towards its success," *United States v. Wiley,* 846 F.2d at 154 (internal quotation marks omitted); *see also United States v. Aiello,* 864 F.2d 257, 263 (2d Cir.1988).

▌Here, the underlying crime was "knowingly execut[ing], or attempt[ing] to execute, any scheme or artifice with the intent ... to defraud the United States," 18 U.S.C. § 1031(a)(1), in connection with requests for Medicare contract payments. Best contends that the evidence was insufficient to show that he had the requisite knowledge. We disagree.

▌A defendant seeking to overturn a conviction on the ground that the evidence was insufficient bears a heavy burden. *See, e.g., United States v. Desimone,* 119 F.3d 217, 223 (2d Cir.1997), *cert. denied,* 525 U.S. 874, 119 S.Ct. 174, 142 L.Ed.2d 142 (1998); *United States v. Abelis,* 146 F.3d 73, 80 (2d Cir.), *cert. denied,* 525 U.S. 1009, 119 S.Ct. 527, 142 L.Ed.2d 437 (1998). The government's proof need not exclude every possible hypothesis of innocence, *see, e.g., United States v. Desimone,* 119 F.3d at 223; *United States v. Malpeso,* 115 F.3d 155, 164 (2d Cir.1997), *cert. denied,* 524 U.S. 951, 118 S.Ct. 2366, 141 L.Ed.2d 735 (1998), and where there are conflicts in the testimony, we defer "to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence." *United States v. Morrison,* 153 F.3d 34, 49 (2d Cir.1998); *see, e.g., United States v. Miller,* 116 F.3d 641, 676 (2d Cir.1997), *cert. denied,* 524 U.S. 905, 118 S.Ct. 2063, 141 L.Ed.2d 140 (1998).

▌These principles apply whether the evidence being reviewed is direct or circumstantial. *See, e.g., Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Valenti,* 60 F.3d 941, 945 (2d Cir.1995); *United States v. Sureff,* 15 F.3d 225, 228 (2d Cir. 1994). The jury is entitled to infer from circumstantial evidence that a party had knowledge of a particular fact despite the party's trial testimony denying such knowledge. *See, e.g., Smith v. California,* 361 U.S. 147, 154, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959); *United States v. Villegas,* 899 F.2d 1324, 1338–39 (2d Cir.), *cert. denied,* 498 U.S. 991, 111 S.Ct. 535, 112 L.Ed.2d 545 (1990); *Young v. Abrams,* 698 F.2d 131, 135–36 (2d Cir.1983).

▌The weight of the evidence is a matter for argument to the jury, not a ground for reversal on appeal. *See, e.g., United States v. Roman,* 870 F.2d 65, 71 (2d Cir.), *cert. denied,* 490 U.S. 1109, 109 S.Ct. 3164, 104 L.Ed.2d 1026 (1989). Pieces of evidence must be viewed not in isolation but in conjunction. *See, e.g., United States v. Podlog,* 35 F.3d 699, 705 (2d Cir.1994), *cert. denied,* 513 U.S. 1135, 115 S.Ct. 954, 130 L.Ed.2d 897 (1995). We must reject the sufficiency challenge if, viewing all the evidence in the light most favorable to the prosecution, we conclude that "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original).

In the present case, we conclude that the evidence was sufficient to permit a rational juror to infer that Best knew of, and sought to contribute to the success of, Maciejewski's proposed fraud. Proof of the underlying fraudulent scheme was overwhelming. The evidence showed that Maciejewski wanted to reduce costs in order to help the Company and save his job; that he decided improperly to shift some unreimbursable costs onto the Medicare contract so that the government would pay for those costs; and that he sent a memorandum to Voss instructing Voss to make the fraudulent cost allocations and to make those allocations retroactive.

The proof that Best knowingly sought to assist in Maciejewski's fraudulent scheme was circumstantial but sufficient. The record included the evidence that Maciejewski asked Best to instruct Voss to reallocate 50 percent of the Albany professional relations expenses to the Medicare contract; that Best knew it would be improper to allocate private business costs to the Medicare contract without a valid reason; that Best's memorandum instructing Voss to implement that reallocation was sent shortly after Maciejewski met with Best; that Best's memorandum referred to instructions by Maciejewski; that Best's memorandum, in all significant particulars, matched the fraudulent memorandum that Maciejewski had written a week earlier, to wit, both memoranda were backdated to February, both ordered the allocation of precisely 50 percent of the professional relations costs to the Medicare contract, and both specified that the allocation should be retroactive to January 1, 1992; and that Best, who supervised the Albany professional relations department, had no basis for believing that the Medicare reallocation he ordered was legitimate when he wrote his memorandum.

Although Best claimed that he had written his memorandum because he was instructed to do so by Voss, the jury was entitled to discredit that testimony as entirely implausible, given the evidence that Best was responsible for supervising the Albany professional relations department and would have been familiar with any change in the type of work done by his division, that Voss had no involvement in the operation of the professional relations department in Albany, and that Voss ranked lower in the Company than Best and had no authority over Best.

From the government's evidence, a rational juror could easily infer that Maciejewski and Best had discussed Maciejewski's fraudulent plan and that as a consequence of those discussions, Best wrote his memorandum for the purpose of contributing to the success of Maciejewski's fraudulent scheme.

## C. *The Claimed Ineffective Assistance of Counsel*

Finally, Best contends that his trial counsel's representation was ineffective because he (a) failed to argue that Best's memorandum to Voss was written prior to Maciejewski's memorandum and (b) failed to call witnesses to vouch for Best's personal integrity and to corroborate his testimony as to "comptroller influence over cost-allocation memos, the lack of supervisory control by Best over the company comptroller, and frequent supervisor reliance upon subordinates for the accuracy of financial information" (Best brief on appeal at 33). These contentions need not detain us long.

To establish a claim of constitutionally ineffective assistance of counsel, a convicted defendant must show both (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that but for the deficiency, the likely outcome of the proceeding would have been different. *See Strickland v. Washington*, 466 U.S. 668, 687–96, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Best has not met either prong of this test. Actions or omissions by counsel that "'might be considered sound trial strategy'" do not constitute ineffective assistance. *Id.* at 689, 104 S.Ct. 2052 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). Counsel's election to forgo an unsupported argument plainly falls into this category. Similarly, counsel's decision as to "whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional representation." *United States v. Schmidt*, 105 F.3d 82, 90 (2d Cir.), *cert. denied*, 522 U.S. 846, 118 S.Ct. 130, 139 L.Ed.2d 80 (1997); *see also United States v. Smith*, 198 F.3d 377, 386 (2d Cir.1999) ("The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to

call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." (internal quotation marks omitted)).

In the present case, Best has not shown that the decisions he criticizes fell below an objective standard of reasonableness. It was hardly unreasonable, for example, for counsel not to argue that Best's memorandum was written before Maciejewski's, given that there was no proof that that was so and there was compelling evidence that Maciejewski's was written on May 6 and that Best's was written on May 13. Nor do we see anything unreasonable in counsel's decision not to call the potential witnesses. Calling witnesses to testify regarding Best's reputation for truthfulness would have opened the door for the government to attack Best's character; the decision whether to expose a defendant to such an attack is surely a tactical decision that cannot be second-guessed. With respect to Company procedures, the proposed witnesses' testimony as to whether Best would have taken instruction from Voss would have been speculative.

In any event, given the strength of the government's case, discussed in Part II.B. above, we cannot conclude that there is any likelihood that different performance by counsel would have altered the outcome of the trial.

## CONCLUSION

We have considered all of Best's arguments on this appeal and have found them to be without merit. The judgment of conviction is affirmed.